IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HARSHDEEP KAUR | **SEALED**<br><br>Case No. 1:26mj71 ML |

## CRIMINAL COMPLAINT AFFIDAVIT

I, Brett Heil, being a duly sworn and appointed Special Agent for the Federal Bureau of Investigation (FBI), hereby make the following statement in support of the attached criminal complaint.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 2017. I am currently assigned to the Jacksonville Field Office, Gainesville Resident Agency. I have previously been assigned to the New Orleans, Louisiana Field Office. My duties and responsibilities have included investigating cyber-crime, white-collar crime, domestic terrorism, and crimes against children. I have also assisted in the prosecution of those crimes.

2. The information set forth in this affidavit is based on my personal knowledge, as well as information obtained from other sources, either involved in the investigation or who have personal knowledge of the facts herein. Because this

FILED USDC FLND GV
JUL 28 '26 PM5:10

affidavit is submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit. Rather, it only includes the information necessary to support a finding of probable cause.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) have been committed by Harshdeep Kaur ("Harshdeep"), and other co-conspirators.

## PROBABLE CAUSE

4. In early May 2026, **Victim 1** (an elderly female) received an email claiming to be from Amazon. The email indicated there was a problem with her Campus USA bank account, and that she needed to call a phone number provided in the email. When she called the number, she spoke with "John Harris" from Campus USA, who told her that her identity had been stolen and that her Social Security Number (SSN) was compromised. Harris then directed **Victim 1** to contact an "Agent" from the "Federal Trade Commission" (FTC) named "Michael Chappell." **Victim 1** telephonically contacted Chappell, who told her that numerous people had used her SSN, some of whom used it for drug deals and other illegal acts.

5. Chappell told **Victim 1** that in order to clear her name and receive a new SSN, she would need to make financial payments to the U.S. Government. Chappell got **Victim 1** to divulge the amount of money in her Campus USA checking account, which was a little over $100,000. Chappell then directed **Victim 1** to write a check for the full amount in her checking account and use it to purchase gold bars from a local gold and jewelry dealer.

6. **Victim 1** identified a Gainesville-based gold dealer and used a check to purchase 21 gold bars, worth $101,220. Chappell subsequently directed **Victim 1** to put the gold in a box, along with a piece of paper containing her name, address, and an "FTC ID Number" she was given by Chappell. **Victim 1** was then instructed to take a photo of the items and send it to Chappell. **Victim 1** was told that somebody from the Treasury Department would be coming to her house in McIntosh, FL, to pick up the gold on or about the morning of May 16th.

7. On or about the morning of May 16th, the Treasury Agent did not appear at **Victim 1's** house at the agreed-upon time. Shortly thereafter, Chappell called **Victim 1**, who told her that the Treasury Agent deemed the neighborhood unsafe, and asked that **Victim 1** instead meet the Agent at a local Sunoco gas station that was a few miles from her house.

8. While on the phone with Chappell, **Victim 1** drove to the Sunoco. When she arrived, Chappell had her text him a photo of herself and her car at the

gas station. Soon thereafter, an unknown male subject (UNSUB) wearing a mask pulled up in a light grey Volvo sedan. The UNSUB gave **Victim 1** the code word "butterfly," which Chappell had given her ahead of time. **Victim 1** put the box of gold in the car and the UNSUB drove away.

9. On approximately May 18th, a few days after the initial gold drop-off at the Sunoco, Chappell contacted **Victim 1** and told her more money would be required. **Victim 1** told Chappell that she had close to $500,000 in a J.W. Cole investment account, which was managed by Cornerstone Financial Group (CFG) in Gainesville, FL. The $500,000 represented almost all of **Victim 1's** remaining life savings.

10. Chappell directed her to transfer that money to her Campus USA checking account, again use the funds to buy gold bars, and provide status updates. Chappell also told **Victim 1** that it was very important that she not tell anyone about what was going on.

11. Prior to **Victim 1** transferring her funds and procuring the next batch of gold bars, a concerned citizen who was aware of **Victim 1's** prior gold purchase contacted the FBI. The FBI subsequently contacted and interviewed **Victim 1**, who provided the above-referenced information. The FBI notified **Victim 1** that she

was being defrauded, and **Victim 1** agreed to assist the FBI in identifying/apprehending subjects of the ongoing fraud.

12. At the direction of the FBI, **Victim 1** indicated to Chappell that she had transferred approximately $500,000 in gold from her investment account to her Campus USA account and had subsequently used the funds to procure $497,229 worth of gold (107 1-ounce gold bars). After notifying Chappell that she had procured the gold bars, Chappell scheduled another transfer of the gold from **Victim 1** to the aforementioned "Treasury Agent." The exchange was scheduled for June 1, 2026, in the parking lot of Wells Fargo located at 3505 SW Archer Rd, Gainesville, FL 32608. The pick-up was scheduled for approximately 12:00pm.

13. At the agreed-upon time, **Victim 1** parked her vehicle in the Wells Fargo parking lot and waited for further instructions from Chappell. At the same time, multiple undercover FBI units set up in the vicinity of the location. Multiple FBI units immediately identified a black Kia SUV (Florida License Plate KCEA46) that was already parked in an adjoining lot to the Wells Fargo bank. The vehicle was backed in and the driver, an Indian male subsequently identified as Gurpinder Singh (Gurpinder), was looking toward the Wells Fargo parking lot in the direction of **Victim 1's** vehicle. Over the course of the next 15-20 minutes, your affiant observed Gurpinder on his phone multiple times, often immediately after instances in which Chappell told **Victim 1** he needed to check on the status of

the Agent who was coming to collect the gold. Based on my training and experience, couriers remain in consistent contact with their handlers during the time period just prior to a pick-up from a victim.

14. After some time, Chappell told **Victim 1** that his Agent informed him that the area was not secure and directed her to drive to a gas station approximately 8 miles away located at 12210 SW Archer Road, Archer, FL. At that time, FBI Agents observed the black Kia leave and follow directly behind **Victim 1's** vehicle during the entirety of the trip from Wells Fargo to the gas station.

15. Upon reaching the gas station, **Victim 1** parked in the northeast corner of the lot. Gurpinder parked at a gas pump, but did not get any gas. Gurpinder then entered the gas station, but did not purchase anything. Gurpinder then left the gas station and walked toward a food truck located approximately 20 feet in front of where **Victim 1's** car was parked, where he was off camera. After a few minutes, during which Chappell told **Victim 1** multiple times that he was checking with his Agent about the status of moving forward with the pick-up, Gurpinder walked back to his car and pulled his vehicle directly next to **Victim 1's** vehicle. Gurpinder then got out of his vehicle and walked toward the trunk of **Victim 1's** vehicle, where **Victim 1** had told Chappell the box of gold was located. Gurpinder then appeared to walk past the passenger side of Victim 1's car, back toward the food truck area in front of **Victim 1's** car. Shortly thereafter, your affiant, who was listening to

**Victim 1's** conversation with Chappell via a second phone in the victim's car, heard Chappell ask **Victim 1** whether she had a second phone in the car. After that comment, Gurpinder walked back to his vehicle and began to drive away from the gas station, at which point Gurpinder was detained by the FBI.

16. Subsequent investigation by the FBI corroborated Gurpinder's role as a courier for the fraud scheme and revealed further evidence that Gurpinder was part of an active cell of U.S.- and Indian-based co-conspirators who coordinated with each other using their cellular devices to repeatedly execute the above referenced fraud scheme. One of those co-conspirators was identified as Harshdeep Kaur ("Harshdeep"), whose ties and activities to the fraud scheme were identified as follows:

**<u>Review of Gurpinder Singh's Cellular Device</u>**

17. On June 10, 2026, the Honorable United States Magistrate Judge Midori A. Lowry signed a search warrant for Gurpinder's cellular device, and a review of the device revealed indications of other co-conspirators in the fraud scheme, including Akashdeep. For instance:

18. On May 28-29, 2026, Gurpinder drove through the night from Pensacola, FL to Miami, FL, arriving in West Miami at approximately 5:30am. After arriving in West Miami, location data from Gurpinder's phone indicated that for approximately the next 8 hours he stayed within a small area of the city,

bouncing between gas stations and local businesses, and appearing to mostly stay in his vehicle. During that time, Gurpinder conducted multiple phone conversations with other identified co-conspirators in the fraud scheme, to include Yashdeep Singh ("Yashdeep"), Navjeet Singh ("Navjeet"), and Kuljeet Singh ("Kuljeet"). At approximately 1:45pm, Gurpinder conducted a phone call with Yashdeep, after which he drove to a nearby Chevron gas station. At approximately 2:03pm, Gurpinder sent a WhatsApp message to Yashdeep in Punjabi, which roughly translated to "It's done. What about yours?" Shortly after that, Gurpinder appeared to conduct WhatsApp calls with both Kuljeet and Navjeet, prior to leaving Miami and heading back toward Gainesville and **Victim 1**. While driving toward Gainesville, and approximately 2 hours after the "It's done" text to Yashdeep, Gurpinder received a $1,000 Zelle payment from Askashdeep Singh, who law enforcement later found out was roommates with other members of the conspiracy – Kuljeet, Navjeet, and Yashdeep. Based on my training experience, as well as a subsequent FBI interview of Yashdeep (detailed below), your affiant knows that Gurpinder had likely just conducted a gold pick-up or drop-off and subsequently contacted his co-conspirators and received payment for completion of his task.

**Interview of Gurpinder Singh**

19. On June 22, 2026, Gurpinder was interviewed by investigators. The interview was audio and video recorded. Post-*Miranda*, Gurpinder explained that while he was working at Amazon, he received a call from his friend Yashdeep. Yashdeep had previously lived in California near Gurpinder but now resided in New York. During the call with Yashdeep, Yashdeep put their other friend, Navjeet, on the phone. Gurpinder stated that Navjeet had also previously lived in California but had moved to New York with Yashdeep. Gurpinder knew Navjeet and was friends with him. Gurpinder claimed that Navjeet asked Gurpinder to fly to Florida to pick up his gold chain and bracelet from somewhere in Louisiana. Gurpinder stated that Navjeet told Gurpinder it was urgent. Gurpinder left his shift at Amazon and drove home to pack. Navjeet sent Gurpinder his flight information to fly from California to Pensacola, FL that evening.

20. Prior to leaving for Pensacola, Kuljeet, Navjeet's brother and roommate, gave Gurpinder $1,000 in cash for the trip.

21. Sometime after arriving in Pensacola on May 27, 2026, Gurpinder received a call from an unknown WhatsApp number who was listed only as "Tom" in WhatsApp. Tom, who Gurpinder believed to be in India based on the conversations they subsequently had, told Gurpinder that he was Navjeet's friend,

and to remain in Pensacola until he received further instructions from him regarding picking up Navjeet's gold chains.

22. The next day, Gurpinder called Tom and told him he had to go back to Bakersfield for his job. Tom told Gurpinder they would pay him to do the pickup, which Gurpinder later stated would have been $5,000. Gurpinder then called Navjeet, who confirmed that Tom was Navjeet's friend and would direct him how to pick up the gold items. Gurpinder called Tom again later and Tom told him he was setting the location for the pick-up. Navjeet then sent Gurpinder money for a rental car and told Gurpinder to pick it up.

23. After Gurpinder picked up the rental car, Tom told him to drive to Miami to do the pick-up. Gurpinder protested because he did not want to drive to Miami. Gurpinder claimed that Tom told him he if did not drive to Miami and do the pick-up it would be bad for him, because they knew where he lived and where his friends lived. Gurpinder called Navjeet to tell him that Tom was treating him like that and Navjeet told Singh he had to do the pick-up. At that point, it was obvious to Gurpinder that what they were asking him to do was illegal.

24. Gurpinder drove through the night to Miami and parked in a Best Buy parking lot after arriving. A few hours after arriving, Tom called him and told him the pick-up would actually be in Gainesville, Florida, and to drive back there immediately. Based on location data from Gurpinder's phone, your affiant knows

that Gurpinder was actually in Miami much longer, and as noted above, at one point sent Yashdeep a text message that stated, "It's done. How about yours?" Regardless, later that day Gurpinder started driving to Gainesville and arrived late Friday night.

25. Gurpinder spent the weekend in Gainesville. On Monday morning, Tom called Singh and told him the pick-up would occur at a Wells Fargo bank in Gainesville, setting in motion the events of June 1, 2026, as described above. Gurpinder stated that Tom remained on the phone with him almost the entirety of the timeframe between Gurpinder's arrival at Wells Fargo and Gurpinder's travel to, and activity at, the Chevron gas station prior to his arrest.

26. Gurpinder told investigators that, had he received the package of gold from **Victim 1**, his instructions from Tom and Navjeet were to drive the package to New York where Yashdeep and Navjeet were staying and give the package to Navjeet – after which he would have been given $5,000. In preparation for his drive up to New York, Gurpinder mapped out his planned travel and conducted Google searches on his phone to see if there were any border crossings or police checkpoints along the way. Gurpinder told investigators he researched police checkpoints because he knew he was bringing an illegal package up to Navjeet and he didn't want to get stopped by police along the way.

27. Gurpinder stated the individuals he knew were involved in the fraud scheme included Kuljeet, Navjeet, and Tom.

**Bakersfield Police Department Report**

28. On July 16, 2026, your affiant contacted Detective Ryder of the Bakersfield (CA) Police Department (BPD) related to a local arrest report involving Kuljeet at address 11717 California Poppy Drive, Bakersfield, CA 93311. The report indicated that on June 27, 2026, Kuljeet and Akashdeep were arrested following a search warrant conducted at the above-listed address, during which law enforcement identified a number of unregistered guns.

29. Pursuant to the search and arrest, BPD seized Kuljeet's phone – an iPhone 17 assigned call number 661-564-1446. A subsequent review of the device by BPD revealed messages and photographs indicating that Kuljeet was involved in a potential fraud scheme involving the receipt of packages of gold. Detective Ryder told your affiant he reviewed photos/videos on Kuljeet's phone in which Kuljeet appeared to be opening a box full of gold or cash. Further, when BPD searched Kuljeet's address, they noted the house was filled with open UPS boxes.

30. Pursuant to the search and arrest, BPD seized Kuljeet's phone, an iPhone 17 assigned call number 661-564-1446, and on July 17, 2026, the Honorable United States Magistrate Judge Midori A. Lowry signed a search warrant for the device.

31. A review of the device revealed numerous photographs of gold and cash, along with pertinent WhatsApp messages between Kuljeet and other identified co-conspirators, including Harshdeep (detailed further below), Akashdeep, Navjeet, Yashdeep, and Tom.

**701 Pacheco Road, Apartment C, Bakersfield, CA**

32. Further review of Kuljeet's device revealed numerous instances in which Kuljeet and Tom discussed packages containing large amounts of U.S. currency sent to various addresses in Bakersfield, California. The FBI identified the senders of those packages, most of whom were elderly individuals, and some of whom had filed police reports about being defrauded into sending money through the mail. Based on my training and experience, your affiant knows that convincing elderly individuals to send money through the mail, often after convincing them that there is a warrant out for their arrest, is an offshoot of the gold courier scam, which is often perpetrated by the same criminal actors/networks.

33. In multiple recent instances, Kuljeet and Tom discussed packages sent to 701 Pacheco Road, Apartment C, Bakersfield, CA 93307. The messages also included videos Kuljeet sent to Tom of an Indian male (believed to be Kuljeet) opening sealed packages to reveal large sums of cash, which had often been stored either within a locked container or hidden within the pages of a book inside the package.

34. For instance, on June 11, 2026, Tom sent Kuljeet the text, "Ye Jo aaya hai 20000 hai Isme sie," which roughly translates to, "the amount that has come in is 20,000; this includes the CA charges." Kuljeet then sent "Tom" an image of a box with a UPS label addressed to 701 Pacheco Rd, Apt C, Bakersfield, CA 93307. Tom replied with, "Proper vudeo banana hai," which roughly translates to "a proper video needs to be made."

35. Kuljeet then sent a video of an Indian male (believed to be Kuljeet) opening a box which contained two approximately $10,000 bundles of cash. Based on a review of online publicly available images of the interior of the residence, the video appeared to have been filmed inside 701 Pacheco Rd, Apt C, Bakersfield, CA 93307.

36. Separately on June 11, 2026, Tom sent Kuljeet tracking information for a package routed to 701 Pacheco Rd, Apt C, Bakersfield, CA 93307, listing "14,000$" as the amount, along with a confirmation image for a delivery to the residence. Tom then texted, "Utha lo," which roughly translates to "pick it up." Based on a review of online publicly available images of the residence, the delivery photo appears to be that of the exterior of 701 Pacheco Rd, Apt C, Bakersfield, CA 93307:




37. Subsequent investigation into the address revealed a BPD report associated with a request for assistance from police in New York involving an elderly victim who sent a large amount of cash via UPS addressed to "Sierra Snow" at 701 Pacheco Road apt. C in Bakersfield CA. “Sierra” and “Carissa” Snow were frequently listed as the recipient on packages delivered to all addresses listed in this warrant, despite no evidence that anyone under those names lived at the addresses.

38. In another instance, on June 9, 2026, the Sarasota (FL) County Sheriff's Office spoke to victim Ana Knight, whose name and address matched the sender details of one of the packages that Kuljeet had discussed with Tom. Knight stated she received an email regarding fraudulent charges on one of her accounts in California related to pornography. Knight stated she called a phone number provided in the email and spoke with someone who identified himself as "Kevin." Kevin told Knight he was an investigator who would assist her and informed her that her social security number was associated with over $3,000,000 being moved offshore through fraud. Knight stated Kevin advised her she needed to contact the Federal Trade Commission, Treasury Department, and Federal Bureau of Investigation, and that she would need to obtain a new social security number. Kevin instructed Knight to liquidate her stock funds and send $10,000 in cash to an address in California. Knight stated she withdrew $10,000 from her savings account and placed the cash in a box as directed. She sent the package via UPS to someone named "Carissa" at 701 Pacheco Road, Apt C, Bakersfield, California, 93307. The amount of cash and the recipient address were the same as the information discussed by Kuljeet and Tom.

**Harshdeep Kaur**

39. Harshdeep Kaur is known to law enforcement as Kuljeet's sister. Her California Driver's License, as well as law enforcement databases, list her primary

residence as 701 Pacheco Road, Apartment C, Bakersfield, CA which, as noted above, law enforcement has identified as a primary residence associated with the receipt of cash obtained from the victims of fraud.

40. A review of Kuljeet's phone revealed Harshdeep's direct involvement in the fraud scheme, as the two frequently discussed and coordinated the receipt and distribution of packages and large amounts of U.S. currency. For instance:

41. On June 15, 2026, Harshdeep texted Kuljeet the following, "I will call you. You should get 1%." "Today's total is $7,000." "The parcel you received. I have it."

42. Further information from Kuljeet's phone revealed Harshdeep to be acting as an accountant for the organization. For instance:

43. In their text communications, Harshdeep referenced "Tom" and Navjeet ("NAVI") numerous times and indicated they were sending money to both.

44. On June 23, 2026, Harshdeep and Kuljeet sent the following texts referring to Tom, Navjeet and "Manpreet," who the FBI subsequently identified as another co-conspirator in the fraud scheme:

**Harshdeep:**

- "Kuljeet, I have your $1,500, one $10,000, another $10,000, and the one NAVI brought. He took $5,000 from it. I also put $10,000

into the India money, and I added more money today."

- "I deducted today's $4,000 for NAVI and $2,000 for MANPREET. NAVI also had another $3,000."
- "There was $9,000 and I also have your $1,500."
- "There is approximately $20,500 sitting here."

**Kuljeet:**

- "The one picked up from my house. How much was that"

**Harshdeep:**

- "One had a full $10,000, and the other was short."
- "Now I remember we sent TOM's back and deducted MANPREET's money as well."
- "Now I have $20,500 of your money."
- "Because I added the money from the house."

45. On June 25, 2026, Harshdeep and Kuljeet then had the following conversation:

- **Harshdeep:** "Kuljeet, we forgot about the money."
- **Kuljeet:** "What?"
- **Harshdeep:** "The one you said was $1,000."
- **Kuljeet:** "Did you send it to Navi?"

- **Harshdeep:** "Meaning they all went."; "Then deduct it from TOM's money."
- **Kuljeet:** "Look at the cash one time."; "You only gave me 15."
- **Harshdeep:** "I gave you two groups of 10."; "I told you before to be careful."; "I counted them and kept them all in groups of 10."

**CONCLUSION**

46. Based upon the foregoing, there is probable cause to believe that Harshdeep Kaur did knowingly and willfully conspire to participate in a fraud scheme using wire communications in interstate commerce in violation of Title 18, United States Code, Sections 1343 and 1349.

Brett Heil

____________________________________
Brett Heil, Special Agent
Federal Bureau of Investigation
Gainesville, Florida

Sworn to and subscribed before me
via telephone this 28th day of July 2026.

Midori A. Lowry
Midori A. Lowry
United States Magistrate Judge